UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN P. O'ROURKE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-30216-MGM |
| | ) | |
| HAMPSHIRE COUNCIL OF | ) | |
| GOVERNMENTS, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION REGARDING CROSS MOTIONS FOR
SUMMARY JUDGMENT
(Dkt. Nos. 36 and 39)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

This matter is before the court on the parties' cross motions for summary judgment.  John

P. O'Rourke ("Plaintiff"), proceeding pro se, brought this action against his former employer, the

Hampshire Council of Governments ("Council"), individual members of the Council's Executive

Committee – William R. Barnett, Chair, Eileen Stewart, Vice Chair, Carol P. Constant, Michael

P. Sarsynski, Jr., and George G. Symborski – in their official capacities, and the Council's

Executive Director, Todd D. Ford (collectively "Defendants").  Plaintiff's complaint (Dkt. No. 1)

alleges that Defendants violated 42 U.S.C. § 1983 by depriving him of continued employment

without procedural due process (Count I), breached his employment contract (Count II), violated

the Massachusetts Open Meeting Law ("OML"), Mass. Gen. Laws ch. 30A, §§ 18-25 (Count

III), and conspired to violate 42 U.S.C. § 1983 (Count IV).

Defendant commenced this action on December 26, 2014 (Dkt. No. 1).  After the district

court allowed Defendants' motion to dismiss Count III (Dkt. No. 24), *see O'Rourke v. Hampshire*

*Council of Gov'ts*, 121 F. Supp. 3d 264 (D. Mass. 2015), the parties moved for summary

judgment on the remaining counts (Dkt. Nos. 36, 39). The cross motions have been referred to

the undersigned for a report and recommendation (Dkt. Nos. 38, 51). *See* Fed. R. Civ. P. 72; 28

U.S.C. §636(b)(1)(b). After consideration of the pleadings and after argument on May 26, 2016,

the court recommends that plaintiff's motion (Dkt. No. 36) be denied in its entirety because

whether Plaintiff was terminated pursuant to a legitimate or a pretextual reorganization of the

Electricity Department depends on disputed facts, and that defendant's motion (Dkt. No. 39) be

denied in its entirety because, although Plaintiff had an employment contract, the authenticity of

the reorganization is a trialworthy issue.

    II.    BACKGROUND[1]

---

[1] The facts are drawn from the following: Plaintiff's statement of material facts (Dkt. No. 37); Defendants' statement of material facts (Dkt. No. 40 at 6-9); Defendants' response to Plaintiff's statement of material facts (Dkt. No. 40 at 2-6); Plaintiff's response to Defendants' response to his statement of material facts (Dkt. No. 45-1 at 7-14); and Plaintiff's response to Defendants' statement of material facts (Dkt. No. 45-1 at 15-20). In addition, both parties submitted the following documents: letter of January 31, 2012 from Ford to Plaintiff and "Job Offer Agreement" (Dkt. No. 1 Ex. B at 1-2; Dkt. No. 40-3 at 2-3); Hampshire Council of Governments Personnel Policies and Procedures, as amended and approved on May 30, 2013 (Dkt. No. 1 Ex. C; Dkt. No. 40-5); letter of March 13, 2014 from Assistant Attorney General Jonathan Sclarsic, Division of Open Government to David S. Lawless, Esq. (Dkt. No. 1 Ex. D; Dkt. No. 40-15); Hampshire Council of Governments Charter (Dkt. No. 37-1 at 7-22; Dkt. No. 40-2); minutes of the Executive Committee's executive session of August 8, 2013 (Dkt. No. 37-1 at 29-30; Dkt. No. 40-6); minutes of the Executive Committee's executive session of August 15, 2013 (Dkt. No. 37-1 at 53; Dkt. No. 40-7); minutes of the Hampshire Council of Governments' Electricity Committee's meeting of August 21, 2013 (Dkt. No. 40-8 at 3; Dkt. No. 56-1 at 9); minutes of the Executive Committee's executive session of August 22, 2013 (Dkt. No. 37-1 at 54; Dkt. No. 40-8); minutes of the Council's public meeting of August 22, 2013 (Dkt. No. 40-8 at 4-6; Dkt. No. 56-1 at 11); minutes of the Executive Committee's open session of September 5, 2013 (Dkt. No. 37-1 at 38-39; Dkt. No. 40-9); e-mail of September 6, 2013 from Plaintiff to the Executive Committee (Dkt. No. 37-1 at 42-43; Dkt. No. 40-10 at 2-3); and e-mail of September 6, 2013 from David S. Lawless, Esq. to Plaintiff (Dkt. No. 37-1 at 44; Dkt. No. 40-10 at 4). *See* Fed. R. Civ. P. 56(c)(3), (e); Local Rule 56.1. Where the parties have submitted duplicate documents, only one will be referenced in the discussion.

The following facts are undisputed.  The Council is comprised of twenty municipalities in Hampshire County and is governed by councilors who are elected from each municipality (Dkt. No. 37-1 at 7, 9; Dkt. No. 40-2 at 2, 4).  One of the Council's functions is the provision of regional services, including electricity.  On January 31, 2012, the Council offered to hire Plaintiff as its Electricity Director at an annual salary of $75,000 (Dkt. No. 1 Ex. B at 1; Dkt. No. 40-3 at 2).  Plaintiff accepted the offer and entered into a written employment agreement with the Council on February 6, 2012 (Dkt. No. 1 Ex. A; Dkt. No. 1 Ex. B at 2; Dkt. No. 37 at 7 ¶1; Dkt. No. 40 at 6 ¶1; Dkt. No. 40-3 at 3).  The agreement provided that "[a]ll provisions of the Council Charter, and regulations and rules of the Council relating to personnel policy . . . as they now exist or hereafter may be amended . . . shall apply to [Plaintiff] as they would to other employees of the Council, in addition to the benefits enumerated specifically for the benefit of [Plaintiff] as herein provided" (Dkt. No. 1 Ex. A at 2; Dkt. No. 40 at 6 ¶4).  The Council provided Plaintiff with its Personnel Policies and Procedures Manual ("Personnel Manual") (Dkt. No. 1 Ex. B at 3; Dkt. No. 1 Ex. C; Dkt. No. 40-5).  The Introduction to the Personnel Manual indicated that it was "a covenant between the employer and employee outlining the expectations and benefits of employment" (Dkt. No. 1 Ex. C at 2).

The Personnel Manual discussed the purpose of, the length of, and discharge during the probationary period, as follows:

D.    Probationary Period

1.    Purpose

The probationary period shall be utilized to observe an employee's work performance, including competency, habits, abilities, attitudes, and any other pertinent characteristic, to allow for an effective evaluation of a new employee.

2.    Length of probation

> a) Each new employee . . . shall be required to complete satisfactorily a six-month probationary period . . . .
>
> b) The probationary period may be extended by the Department Head, with approval of the Executive Director, for up to six additional months if it is felt to be justified and that it could allow the employee to develop the ability to perform the duties of the position satisfactorily. . . .

3.      Termination while on probation

> At any time during the probationary period, an employee may be terminated without cause by the Department Head, with approval of the Executive Director.

(Dkt. No. 1 Ex. C at 8; Dkt. No. 40-5 at 9).  This is the only provision of the Personnel Manual that mentioned termination "without cause" (Dkt. No. 37 at 8 ¶4; Dkt. No. 40 at 2 ¶4).  Plaintiff's probationary period expired on or about August 7, 2012 (Dkt. No. 37 at 8 ¶5; Dkt. No. 40 at 2 ¶5).

The Personnel Manual described the procedure for discharging a non-probationary employee or Department Head as follows:

4.      Discharge

> a)     The Executive Director with the Department Head may discharge an employee for unsatisfactory job performance, violation of Council's rules and regulations, or for any situation or instance of such seriousness that discharge is warranted.
>
> b)     The Executive Director, with an Executive Committee member, may discharge a Department Head for unsatisfactory job performance, violation of Council's rules and regulations, or for any situation or instance of such seriousness that discharge is warranted.
>
> c)     An employee shall be given written notice of the discharge signed by the appropriate Department Head and Executive Director specifying:
>
> > •    the date of discharge;
> >
> > •    the specific behavior and dates of the behavior, as appropriate;
> >
> > •    the right to appeal the discharge and the grievance procedures to follow for an appeal.

d)       A copy of the notice of discharge shall be placed in the employer's personnel file. (Dkt. No. 1 Ex. C at 28; Dkt. No. 40-5 at 29).  The Personnel Manual did not discuss the discharge of a Department Head without cause, the elimination of a Department Head's position, or "at will" employment (Dkt. No. 37 at 7 ¶3, at 9 ¶7; Dkt. No. 40 at 2 ¶¶3, 7).

Ford, the Council's Executive Director, was Plaintiff's supervisor (Dkt. No. 37-1 at 14). Plaintiff had four subordinates in the Electricity Department who performed marketing, sales, accounting, and clerical work (Dkt. No. 37-1 at 29, 38; Dkt. No. 40-1 ¶11; Dkt. No. 40-4 at 2; Dkt. No. 56-1 at 19).

The Council's Executive Committee met in a closed (non-public) session on August 8, 2013 (Dkt. No. 37-1 at 29; Dkt. No. 40-6 at 2).  The Executive Committee justified the closed session under the OML on these grounds:

> to discuss trade secrets or confidential, competitively-sensitive or other proprietary information provided in the course of activities conducted by a governmental body as an energy supplier under a license granted by the department of public utilities pursuant to section 1F of chapter 164, in the course of activities conducted as a municipal aggregator under section 134 of said chapter 164 or in the course of activities conducted by a cooperative consisting of governmental entities organized pursuant to section 136 of said chapter 164, when such governmental body, municipal aggregator or cooperative determines that such disclosure will adversely affect its ability to conduct business in relation to other entities making, selling or distributing electric power and energy.  Mass. Gen. Laws ch. 30A, § 21 (10).

(Dkt. No. 37-1 at 29; Dkt. No. 40-6 at 2).  According to the meeting's minutes, the Council's chair, Barnett, reported that he and Ford had discussed the Electricity Department's operation (*id*.).  The Council's vice chair, Stewart, "noted that she was increasingly disturbed since learning about the [electricity program's] $255,000 loss and felt that it needed to be addressed" (*id*.).[2]  In response,

---

[2] The Executive Director prepared the proposed annual operating budgets for presentation and approval by the Council (Dkt. No. 37 at 9 ¶10; Dkt. No. 40 at 2 ¶10).  For fiscal year 2013, the "administrative overhead" for two Electricity Department accounts totaled $206,140 (Dkt. No.

Ford provided context around finances and the electricity program [by] reviewing cash flow and budget items.  Ford stated that he accepted full responsibility for the error; he relied on numbers which included gross errors in alternative compliance payment [ACP] obligations.  Ford became aware of the situation when he was asked to authorize a payment in excess of $250,000.

(*id.*).

Ford recommended a reorganization of the Electricity Department in an effort to increase profits (*id.*).  Article Six, Section 2 of the Council's Charter -- which is incorporated by reference into Plaintiff's employment contract -- states:

(a)     The Executive Director may from time to time prepare and submit to the Council of Governments councilors plans of organization or reorganization establishing operating departments or agencies for the orderly, efficient or convenient conduct of the business of the Council of Governments.

(b)     Whenever the Executive Director submits an organization plan to the Council of Government councilors, the executive committee shall review such plan and submit the proposal to the Council of Governments councilors with a recommendation as to whether or not it should be approved by the Council of Government councilors.

(c)     The Council of Governments councilors shall approve any plans to reorganize, consolidate or abolish any Council of Governments department or agency in whole or in part or to establish a new Council of Governments department or agency by a two-thirds weighted vote.  Such changes shall become part of the administrative code.

(Dkt. No. 1 Ex. A at 2; Dkt. No. 37-1 at 19-20; Dkt. No. 40 at 7 ¶10; Dkt. No. 40-2 at 14-15).

In the proposed restructured department, the staff would be reduced to "sales, clerical, and accounting" personnel (Dkt. No. 37-1 at 29; Dkt. No. 40-6 at 2).  A consultant with strong business and accounting expertise would perform the other services, including "all of the

---

37 at 9-10 ¶11; Dkt. No. 40 at 2 ¶11).  There were no amounts in these two accounts for fiscal years 2012, 2014, and 2015 (*id.*).  The parties dispute whether Ford created a portion of the Electricity Department's budget deficit in fiscal year 2013 by shifting administrative overhead expenses into the department's budget (Dkt. No. 37 at 10 ¶12; Dkt. No. 40 at 3 ¶12).

technical responsibilities of the electricity program" (*id.*).  Ford had not discussed this proposal with the Council's employees (*id.*).

On August 15, 2013, the Council's Executive Committee again met in a closed session to continue their discussion of Ford's proposed restructuring of the Electricity Department (Dkt. No. 37-1 at 53; Dkt. No. 40-7 at 2).[3]  Ford reported that a consultant, Customized Energy Solutions ("CES"), had experience in several technical areas, including "alternative compliance payments, . . . and a number of other fees," which "would save money . . . and correct gaps of expertise" in the Electricity Department (*id.*).  Because Ford recommended that the Electricity Department be reorganized as soon as possible, the Executive Committee voted to immediately eliminate Plaintiff's position, to terminate his employment, and to award him two weeks' pay (*id.*).  The Executive Committee also agreed to bring Ford's plan to hire a consultant for a vote before the full Council (*id.*).

On the morning of August 19, 2013, Ford notified Plaintiff that "the 'Electricity Department would be going in another direction and [he] will be laid off'" effective immediately (Dkt. No. 37-1 at 33; Dkt. No. 40 at 8 ¶17; Dkt. No. 45-1 at 19 ¶17).  The Council did not give Plaintiff any prior notice of his dismissal (Dkt. No. 37 at 9 ¶8, at 12 ¶19; Dkt. No. 40 at 2 ¶8).

The Council's Electricity Committee met on August 21, 2013 (Dkt. No. 40-8 at 3; Dkt. No. 56-1 at 9).  The minutes indicate that Plaintiff had "resigned" (*id.*).  The committee discussed the reason for the $250,000 budget deficit (*id.*).  The Council's vice chair, Stewart, identified two circumstances that contributed to the operating loss, and indicated that the Council did not really know "how to run the program at a profit," despite the Council's knowledgeable staff and the

---

[3]  To excuse the meeting from being held in a public session, the Executive Committee cited the same exemption from the OML as it cited on August 8, 2013 (Dkt. No. 37-1 at 53; Dkt. No. 40-7 at 2).

assistance of their two consultants, Energy New England and Energy Systems Group (*id.*).  The Electricity Committee was advised that Ford and the Executive Committee were determined to address the electricity program's deficit and were considering hiring CES to help the Council manage the program (*id.*).

In another session that was closed to the public on August 22, 2013, the Council's Executive Committee voted to apprise the full Council of the proposed reorganization of the Electricity Department (Dkt. 37-1 at 54; Dkt. No. 40-8 at 2).[4]  The Executive Committee, through Ford, presented the reorganization plan to all councilors during their public meeting later that evening (Dkt. No. 56-1 at 13; Dkt. No. 40-8 at 6).  The Council heard that "[t]he proposed restructuring would include eliminating the Electricity Director position and placing responsibility with professionals" (*id.*).  The Executive Committee reported that, due to time constraints, they voted to dismiss Plaintiff without giving him prior notice (*id.*).  The councilors were told that Plaintiff resigned after he received notice of his discharge (*id.*).  Because "[t]he [c]ouncilors were confused as to why [Plaintiff] submitted his resignation," Barnett and Ford agreed to meet with him (*id.*).

The Council's discussion then focused on the Electricity Department's proposed reorganization (*id.*).  The councilors were advised that, under the restructured plan, "professional companies" would handle the "technical" aspects, while the Council would maintain its strong clerical, sales, and accounting personnel (*id.*).  The full Council voted to support the Electricity Department's reorganization (*id.*).

---

[4] The Executive Committee's stated reason for the closed session was the same as on August 8 and 15, 2013 (Dkt. No. 37-1 at 54; Dkt. No. 40-8 at 2).

Between August 26 and September 6, 2013, Plaintiff repeatedly requested a meeting with the Executive Committee (Dkt. No. 37 at 13 ¶21, at 14 ¶26; Dkt. No. 37-1 at 36, 37; Dkt. No. 40 at 3 ¶21).  On August 26, Plaintiff asked Barnett's permission to discuss his discharge with the Executive Committee in a nonpublic session (Dkt. No. 37-1 at 31; Dkt. No. 40 at 4 ¶22).  Plaintiff's e-mail message said that by terminating his employment, Ford violated laws and "left the Council vulnerable to legal action and at risk for substantial monetary damages" (*id.*).  On August 28, Barnett denied Plaintiff's request for a meeting and instructed Plaintiff to direct his future communications to the Council's legal counsel (Dkt. No. 37 at 13 ¶23; Dkt. No. 40 at 4 ¶¶23, 27).[5]

Plaintiff contacted Barnett by e-mail the next day, reviewed the events that surrounded his discharge, and requested an explanation (Dkt. No. 37-1 at 33; Dkt. No. 40 at 4 ¶25).  Plaintiff asked the Council's attorney to arrange a meeting with Barnett (Dkt. No. 37-1 at 34; Dkt. No. 40 at 4 ¶25).

Plaintiff, Barnett, and counsel met on September 5, 2013 and Plaintiff again requested an opportunity to address the Executive Committee (Dkt. No. 37 at 14 ¶27; Dkt. No. 37-1 at 38; Dkt. No. 40 at 4 ¶28; Dkt. No. 40-9 at 2).  After the meeting, counsel e-mailed Plaintiff a letter, which stated that Plaintiff's "separation" from the Council did not entitle him to the grievance procedure contained in the Personnel Manual because the employment policy did "not address the topics of either layoffs or resignation" (Dkt. No. 37-1 at 41; Dkt. No. 40 at 5 ¶30).

---

[5] Defendants' response to paragraph 23 in Plaintiff's Statement of Material Facts is contained in paragraphs 23 and 24 (Dkt. No. 37 at 13 ¶23; Dkt. No. 40 at 4 ¶¶23, 24).  From that point on, Defendants' numbered responses do not correspond to Plaintiff's enumerated paragraphs in his statement of material facts (*id.*).  The court references the paragraphs as numbered in Defendants' response.

At the public Executive Committee meeting later on September 5, 2013, Barnett reported that he had met with counsel and Plaintiff (Dkt. No. 37-1 at 38; Dkt. No. 40-9 at 2).  After Barnett consulted counsel, Barnett agreed to permit Plaintiff to address the Executive Committee as long as he limited the scope of his comments (*id.*).  Plaintiff told the Executive Committee that he had not been involved in discussions about restructuring the Electricity Department and that "a major change in the Electricity Department would be a mistake [from a business perspective] and would show the Council as being disorganized and weak . . ." (*id.*).  Plaintiff further indicated that he could perform the same functions as the third-party consultant and that savings from the use of a consultant would be "minimal" (*id.*).

After Plaintiff addressed the Executive Committee, the committee members discussed the Electricity Department's reorganization and the need for "expertise" to avoid the financial losses that they had experienced in most years (Dkt. No. 37-1 at 38-39; Dkt. No. 40-9 at 2-3).  The Executive Committee determined that it was necessary to reorganize, but not eliminate, the Electricity Department (*id.*).  The Executive Committee voted to authorize Ford to execute the contract with the consultant, CES, after legal counsel's review (*id.*).  The Council and CES entered into a contract for services at a later date (Dkt. No. 40-11 at 5).

Plaintiff sent an e-mail message to the Executive Committee on the day after he addressed them indicating that he had not been permitted to discuss "the multiple violations of the Personnel Policies and Procedures of the Council or the multiple violations of the Massachusetts General Law[s] surrounding [his] discharge" because counsel had restricted his presentation to specific topics (Dkt. No. 37 at 15 ¶30; Dkt. No. 37-1 at 42; Dkt. No. 40 at 5 ¶31; Dkt. No. 40-10 at 2).  Plaintiff repeated his opinion that eliminating the Electricity Director's position was a "BAD BUSINESS DECISION" due to the Council's involvement in the

Department of Public Utilities' "municipal aggregation approval process" at that time and the importance of the municipal aggregation revenue to the Council's "survival" (Dkt. No. 37-1 at 42-43; Dkt. No. 40-10 at 2-3) (emphasis original).  Plaintiff reiterated that he could provide the same services as the consultants at the same cost (*id.*).  The Council's attorney e-mailed Plaintiff later that morning and directed him not to contact councilors or staff members again (Dkt. No. 37-1 at 44; Dkt. No. 40-10 at 4).

Plaintiff requested the Council's records, including minutes of its meetings, on or before September 19, 2013 (Dkt. No. 37-1 at 45).  On October 18, 2013, he filed a complaint with the Office of the Attorney General's Division of Open Government ("AG") alleging that the Council violated the OML on August 8, 15, and 22, 2013 (Dkt. No. 1 Ex. D at 1; Dkt. No. 40-15 at 2). The Executive Committee's executive session minutes for those dates were made available to the public on October 24, 2013 after counsel's review and approval of their release (Dkt. No. 37 at 15 ¶¶32, 33; Dkt. No. 37-1 at 45, 46; Dkt. No. 40 at 5 ¶¶33, 34; Dkt. No. 56-1 at 21).  The AG's investigation of Plaintiff's complaint involved a review of the pertinent meeting minutes, the Executive Committee's and the Council's responses to the AG's questions, and other material (Dkt. No. 1 Ex. D at 1-7; Dkt. No. 37 at 16 ¶35; Dkt. No. 40 at 6 ¶¶36, 37; Dkt. No. 40-15).  The AG opined that the Executive Committee of the Council violated the OML on August 8, 15, and 22, 2013 by holding three sessions that were closed to the public (*id.*).  The AG determined that the Executive Committee's "discussion of restructuring the Electricity Department and terminating the Director" did not concern "trade secrets or confidential, competitively-sensitive or other proprietary information," which was the exception to the OML cited as the basis for holding the three closed-door sessions (Dkt. No. 1 Ex. D at 5-7; Dkt. No. 40-15 at 6-8).  However, because the full Council voted to restructure the Electricity Department and to

eliminate Plaintiff's position in a public session on August 22, 2013, the full Council did not

violate the OML (Dkt. No. 1 Ex. D at 6-7; Dkt. No. 40-15 at 7-8).

III.    <u>DISCUSSION</u>

A.    <u>Standard of Review</u>

One of the principal purposes of summary judgment is to "assay the parties' proof in

order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976

F.2d 791, 794 (1st Cir. 1992).  Rule 56(a) of the Federal Rules of Civil Procedure sets forth the

standard for ruling on a motion for summary judgment:  "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  "Genuine issues of fact are those that a

factfinder could resolve in favor of the nonmovant, while material facts are those whose

'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain*

*Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P. R., Inc. v.*

*Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011)).  *See also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of demonstrating "the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Once the moving party

has properly supported [his] motion for summary judgment, the burden shifts to the nonmoving

party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier

of fact reasonably could find in his favor." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.

1997) (citing *Celotex Corp.*, 477 U.S. at 322–25).  "The nonmovant may defeat a summary

judgment motion by demonstrating, through submissions of evidentiary quality, that a

trialworthy issue persists." *Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir. 2006) (citing

*Celotex Corp.,* 477 U.S. at 322–24).  "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden.'"  *Sánchez-Rodríguez v. A.T. & T. Mobility P. R., Inc.,* 673 F.3d 1, 9 (1st Cir. 2012) (quoting *DePoutot v. Raffaelly,* 424 F.3d 112, 117 (1st Cir. 2005)).  Instead, "the party seeking to avoid summary judgment 'must be able to point to specific, competent evidence to support his claim.'"  *Soto–Ocasio v. Fed. Express Corp.,* 150 F.3d 14, 18 (1st Cir. 1998) (quoting *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir. 1992)).

"When determining a motion for summary judgment, the court must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor."  *Lipson v. Johnson & Wales Univ.*, No. 96-159B, 1997 WL 576397, at *2 (D.R.I. July 17, 1997) (citing *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 820 (1st Cir.1991)).  "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn."  *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir. 1997).  Summary judgement is not appropriate when a material fact is in dispute.  *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."  *Anderson*, 477 U.S. at 255.

B.    Violation of Due Process (Count I)

Plaintiff alleges that Defendants' termination of his employment without notice and an opportunity to respond deprived him of his constitutionally protected property interest in continued employment without due process, in violation of 42 U.S.C. § 1983.  Defendants counter that as an at-will employee, Plaintiff did not have a property interest in continued

employment, and, if he did have a property right, his due process claim is not viable because he was terminated pursuant to the Electricity Department's bona fide reorganization.

"The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving any person of 'life, liberty, or property, without due process of law.'" *Harron v. Town of Franklin*, 660 F.3d 531, 535 (1st Cir. 2011) (quoting U.S. Const. amend. XIV, § 1). This prohibition "'applies fully to a state's political subdivisions . . . .'" *DePoutot,* 424 F.3d at 117 (citing *Home Tel. & Tel. Co. v. City of Los Angeles,* 227 U.S. 278, 286–87 (1913)). Courts "'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *González–Fuentes v. Molina,* 607 F.3d 864, 886 (1st Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). "Fundamentally, procedural due process requires notice and an opportunity to be heard." *Mancini v. Northampton Cty.*, No. 15-2790, No. 15-2873, No. 15-3012, 2016 WL 4709108, at *6 (7th Cir. Sept. 9, 2016) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1976)). *See also Clukey v. Town of Camden*, 717 F.3d 52, 59-60 (1st Cir. 2013).

Here, the second question is not disputed: the parties agree that Plaintiff did not receive a pretermination notice and an opportunity to respond either before or after his discharge. The question is whether he was entitled to these due process procedures, or whether the reorganization exception eliminated the need for them. In light of the parties' evidence, neither party is entitled to judgment as a matter of law on this issue. *See* Fed. R. Civ. P. 56(a).

      1.     Constitutionally Protected Property Interest in Continued Employment

The first question that must be addressed is whether Plaintiff had a constitutionally protected "property interest[]" in the terms and conditions of his employment. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).

> A public employee has a constitutionally protected interest in continued employment where he has a reasonable expectation arising out of state statute, rules or the contract, that he will continue to be employed. Thus, ordinarily, one who can be removed only for "cause" has a constitutionally protected "property" interest, while one whose job is held "at will" does not.

*Perkins v. Bd. of Dirs. of Sch. Admin. Dist. No. 13,* 686 F.2d 49, 51 (1st Cir. 1982) (citations omitted). *See also Ventetuolo v. Burke,* 596 F.2d 476, 481 (1st Cir. 1979). "[W]hether or not [Plaintiff's] interest in [his] job rises to the level of constitutionally protected 'property' depends upon whether the [Defendants] could dismiss [him] only for 'cause' — an issue of state law." *Perkins,* 686 F.2d at 52.

"Massachusetts law assumes at-will employment, unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment." *Derrig v. Wal–Mart Stores, Inc.,* 942 F. Supp. 49, 54 (D. Mass. 1996). "Thus, one does not have a constitutionally protected property interest in their employment by default." *O'Rourke*, 121 F. Supp. 3d at 270. "By contrast, if one is employed through an employment contract (implied or otherwise), cause is likely a prerequisite to termination." *Id.* at 271.

"It is well-settled in Massachusetts that an employee handbook or personnel manual may form the basis of an employment contract that is beyond that of at-will employment." *Beebe v. Williams Coll.*, 430 F. Supp. 2d 18, 23 (D. Mass. 2006); *see O'Brien v. New Eng. Tel. & Tel. Co.*, 664 N.E.2d 843, 847 (Mass. 1996) (discussing circumstances under which a personnel manual may give rise to a binding contract). "[C]ourts in this district have applied a two-pronged approach" to "determine whether a personnel manual "effectively implies an employment

contract" under Massachusetts law. *O'Rourke*, 121 F. Supp. 3d at 271 (citing *Derrig*, 942 F. Supp. at 55). "[T]he central inquiries are: First, did the employee believe that the employment manual[ ] he . . . was given constituted the terms or conditions of employment, equally binding on employee and employer? Second, was this belief reasonable under the circumstances?" *Derrig*, 942 F. Supp. at 55.

> The Massachusetts Supreme Judicial Court has also outlined several additional factors to consider (none of which is dispositive), holding that "there is no implied contract based on the terms of a personnel manual where: (1) the employer retained the right to unilaterally modify terms; (2) the terms of the manual were not negotiated; (3) the manual stated that it provided only guidance regarding the employer's policies; (4) no term of employment was specified in the manual; and (5) the employee did not sign the manual to manifest assent."

*O'Rourke*, 121 F. Supp. 3d at 271 (quoting *Day v. Staples, Inc.*, 555 F.3d 42, 58–59 (1st Cir. 2009)).

The existence of a contract may be a question of fact. *See Jackson v. Action for Bos. Cmty. Dev., Inc.*, 525 N.E.2d 411, 412-13 (Mass. 1988) (citing *Maynard v. Royal Worcester Corset, Co.*, 85 N.E. 877, 878-79 (Mass. 1908)). Here, however, the undisputed evidence on this issue has not changed since the district court rejected Defendants' contention that Plaintiff was an "at will" employee, determined that he had an employment contract, and denied Defendants' motion to dismiss on this basis. *O'Rourke,* 121 F. Supp. 3d at 271-72. The court reached this conclusion after examining Plaintiff's complaint and the attached exhibits, including his employment agreement (Dkt. No. 1 Ex. A), and the Council's Personnel Manual (Dkt. No. 1 Ex. C). *Id.* at 271.

Despite the different standards that apply to the resolution of a motion to dismiss and a motion for summary judgment, there is no reason to revisit the district court's decision. The law of the case applies where, as here, the motions are supported by the same evidence.

The ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint. On the other hand, a Rule 56 motion may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss.

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure Civil* § 2713 (3d ed. 1998); *see also Conley v. United States*, 323 F.3d 7, 13 (1st Cir. 2003) (explaining that one ground for deviating from the law of the case is "where there is new evidence on the question at issue"); *P.D.K. Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004) ("Even if different language is used in a summary judgment motion than in a previous motion to dismiss, if the same legal theory supports both motions, the disposition of the motion to dismiss may serve as the law of the case and on these grounds, a court may similarly dispose of a motion for summary judgment.").

The district court concluded that Plaintiff reasonably believed the Personnel Manual's terms constituted an employment contract with the Council because they were incorporated by reference into his written employment agreement and because the Personnel Manual's introduction stated that it was a "covenant" between the Council and the employee.[6] *See O'Rourke*, 121 F. Supp. 3d at 271-72. The manual stated that a Department Head, such as Plaintiff, could be discharged only for cause after the expiration of the six-month probationary period (Dkt. No. 1 Ex. C at 28; Dkt. No. 40-5 at 29). *Id*. This restriction on Plaintiff's removal gave him a constitutionally protected property interest in continued employment. *Id*. at 272. Accordingly, due process required that notice and "'some kind of hearing'" precede his dismissal,

---

[6] In support of his claim that he had an implied employment contract, Plaintiff has submitted the Council's 2016 Personnel Manual and highlights the changes that have been made since 2013 (Dkt. Nos. 46 and 46-1). The court does not consider these materials because the issue has been resolved in Plaintiff's favor on other grounds.

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Roth*, 408 U.S. at 569-70), unless he was discharged due to a bona fide reorganization of the Electricity Department. *See Whalen v. Mass. Trial Court*, 397 F.3d 19, 24 (1st Cir. 2005).

> 2. Reorganization Exception

Federal courts have recognized that "pre-termination hearings are not required by due process where a bona fide government reorganization plan bases dismissals on factors unrelated to personal performance." *Rodriguez-Sanchez v. Municipality of Santa Isabel*, 658 F.3d 125, 130 (1st Cir. 2011) (citing *Whalen*, 397 F.3d at 25). *See also Misek v. City of Chicago*, 783 F.2d 98, 101 (7th Cir. 1986) (recognizing that "there is an exception to a hearing right when the discharge is caused by reorganization"); *Hartman v. City of Providence,* 636 F. Supp. 1395, 1410 (D.R.I. 1986) ("an employee who loses his or her job . . . is not entitled to a hearing, despite the presence of a 'no dismissal except for cause' rule, when the position is abolished pursuant to a bona fide government reorganization or kindred cost-cutting measure"). "The reason for this rule is quite simple:  if an employee is losing [his] job not because of allegedly deficient performance but for extraneous reasons relating to fiscal and operational concerns, a hearing regarding the quality of the employee's performance would serve no useful purpose." *Digiacinto v. Harford Cty.,* 818 F. Supp. 903, 906 (D. Md. 1993).

"An exception to this rule applies where a plaintiff can establish that the reorganization was not carried out in good faith and was merely a subterfuge." *Id.*  "[I]f a purported municipal reorganization is merely a pretext for terminating an individual for other . . . reasons, the reorganization exception is inapplicable." *Day v. City of Providence*, 338 F. Supp. 2d 310, 317 (D.R.I. 2004).  "To hold otherwise would allow government officials to cry 'reorganization' in order to circumvent the constitutional and statutory protections guaranteed . . . employees."

*Misek*, 783 F.2d at 101.  *See Hartman,* 636 F. Supp. at 1416 ("courts cannot permit the exception

to become a convenient ruse whereby a government agency, simply by affixing a label, can

avoid the necessity for demonstrating 'cause' when it wishes to dismiss a particular employee");

*Garvey v. Lowell*, 85 N.E. 182, 182 (Mass. 1908) ("There is a real and fundamental distinction

between the laudable abolition of an unnecessary position and the discharge of a faithful

employé in violation of the rights secured to him by statute; and the latter can neither be

conceded nor protected by a pretense that it was an exercise of the former right.").

Plaintiff alleges that the reorganization that abolished the Electricity Director's position

was a pretext to terminate his employment in violation of the terms of the employment contract.

*See Connolly v. City of Rutland,* Civil Action No. 2:09-CV-183, 2011 WL 3739064, at *13 (D.

Vt. Aug. 24, 2011), *aff'd,* 487 F. App'x 666 (2d Cir. 2012) ("the reorganization exception does

not apply if an employee raises a genuine issue of material fact that her purported economic

layoff was actually a pretext for some other impermissible reason for the termination").

Defendants dispute this allegation and claim that the good faith reorganization eliminated the

need for due process procedures.  *See Rodriguez-Sanchez,* 658 F.3d at 130.  As a result of these

competing positions, the court "must inquire into the 'bona fides' of the [D]efendants' explanation

of the bases for the [P]laintiff['s] termination[] in order to guard against a 'devious attempt by

"government officials to cry 'reorganization' in order to circumvent the constitutional and

statutory protection guaranteed public employees."'"  *Christian v. Cecil Cty.*, 817 F. Supp. 1279,

1284 (D. Md. 1993) (quoting *Hartman,* 636 F. Supp. at 1417).

The parties agree upon certain facts:  the Electricity Department ended fiscal year 2013

with a loss (Dkt. No. 37-1 at 29; Dkt. No. 40-6 at 2); $206,141 of "administrative overhead"

expenses were reflected in the Electricity Department's budget for fiscal year 2013, but were not

19

included in the department's budgets for fiscal years 2012, 2014, and 2015 (Dkt. No. 37-1 at 23, 24; Dkt. No. 40-14 at 4); the Electricity Department's deficit was a basis for the department's restructuring that included the Executive Committee's approval of Plaintiff's discharge in their non-public session on August 15, 2013 (Dkt. No. 37-1 at 29, 53, 54; Dkt. No. 56-1 at 13); Ford discharged Plaintiff four days later without notice (Dkt. No. 37-1 at 5 ¶14; Dkt. No. 40 at 8 ¶17); and Plaintiff's termination was effective immediately (Dkt. No. 37-1 at 5 ¶15; Dkt. No. 40 at 8 ¶17).  The parties dispute Defendants' motive and intent regarding Plaintiff's termination.  *See Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 473 (1962) ("summary judgment procedures should be used sparingly . . . where the issues of motive and intent play leading roles . . . . It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised").

Courts have examined the following factors to discern whether a reorganization was legitimate or was a pretext:  (a) whether the employee's position was eliminated as part of a restructuring plan; (b) whether the employer conducted an evaluation beforehand to determine if the alleged reorganization would result in cost-savings; (c) whether the discharged employee's position was abolished, or whether his duties were assumed by another; and (d) whether the entity's organizational structure changed after the employee's termination.  *See Potkay v. Ament*, 34 F. Supp. 3d 937, 948-952 (E.D. Wis. 2014); *Limes-Miller v. City of Chicago*, 773 F. Supp. 1130, 1139 (N.D. Ill. 1991).

a.  Whether the Electricity Department's alleged restructuring was conducted pursuant to a plan that was the product of an investigation or study.

One factor used to determine the legitimacy of a reorganization is whether it was conducted pursuant to a plan that was formulated after an investigation or a study.  *See Campana*

*v. City of Greenfield*, 164 F. Supp. 2d 1078, 1094 (E.D. Wis. 2001) (holding that the city's studies and discussions of department consolidation prior to the reorganization were indicia of its legitimacy).  Plaintiff alleges that he was not terminated as part of a legitimate reorganization plan and presents evidence from which a factfinder could reasonably conclude that Defendants "purport[edly] eliminate[d] [his] position for systemic reasons when [they were] actually targeting" him.  *Mandel v. Allen*, 889 F. Supp. 857, 875 (E.D. Va. 1995).  *See Schulz v. Green Cty.,* 645 F.3d 949, 953 (7th Cir. 2011) ("A governmental reorganization . . . does not always avoid the need for due process.  When a purportedly legislative decision affects one person . . . it is possible that the effect of the reorganization on a single person is the object of the exercise rather than the byproduct.");  *Potkay*, 34 F. Supp. 3d at 949 (layoff of one person and elimination of one position suggested "an impermissible motive").  As Electricity Director, Plaintiff oversaw the Council's municipal aggregation program (Dkt. No. 1 Ex. A at 2; Dkt. No. 40-4 at 2).  He alleges that Defendants orchestrated his removal and replaced him with the third-party consultant, CES, to pave the way for the Council's partnership with the Colonial Power Group (CPG) "to [unlawfully] monopolize the municipal aggregation consulting and supply market in Massachusetts" (Dkt. No. 1 at 15 ¶60; Dkt. No. 37-1 at 55-81).  Plaintiff supports this allegation of motive with the June 2013 memorandum of understanding between Ford and CPG to provide services for municipal aggregations, which was finalized in their December 2013 contract (Dkt. No. 37-1 at 68-71, 78-80).  *See Poller*, 368 U.S. at 473.

Plaintiff paints two scenarios in support of his claim that the reorganization was a sham designed to remove him:[7]  Defendants either intended to call his discharge a reorganization from

---

[7] Defendants argue that Plaintiff "did not and cannot dispute that [the reorganization] occurred" (Dkt. No. 41 at 8).  Although Plaintiff discussed the reorganization in his communications with

the outset because they did not have cause to remove him as required by the terms of the employment contract, and the meeting minutes were accurate; or Defendants labelled his discharge a reorganization after-the-fact to justify his termination without compliance with the contract's terms, and fabricated the minutes.  Under the first scenario, Plaintiff alleges that Defendants called his termination a reorganization because they were aware that they could not fire him.  However, they needed to remove him as the manager of municipal aggregation to accomplish their goal of forming a partnership with CPG (Dkt. No. 37-1 at 56-67; Dkt. No. 40-4 at 2).  According to Plaintiff, if the Executive Committee's closed session minutes correctly reflect contemporaneous discussions of reorganization, it is reasonable to infer that the reorganization was a sham designed to terminate him without cause and a hearing so that the Council could form the CPG partnership (Dkt. No. 37 at 12 ¶18; Dkt. No. 45-1 at 17 ¶12).

Plaintiff's second scenario posits that Defendants only became aware of the application of the Personnel Manual's procedures for dismissal of a Department Head when Plaintiff questioned the legality of his discharge on August 26, 2013 (Dkt. No. 37-1 at 31).  Defendants then attached the reorganization label in an after-the-fact attempt to validate their violation of the manual's terms and wrote the Executive Committee's closed-door meeting minutes after that date (Dkt. No. 45-1 at 16-20; Dkt. No. 56 at 4-5 ¶3; Dkt. No. 56-1 at 2-21).  Plaintiff points to the fact that the minutes of these meetings were not available to the public for more than two months and were released only after the Council's legal counsel reviewed and approved them (Dkt. No. 37-1 at 45, 46; Dkt. No. 56-1 at 21).  A reasonable inference could be drawn that the executive session minutes were drafted after-the-fact to buttress Defendants' sham reorganization.

---

the Executive Committee after his dismissal, he never agreed that the restructuring was genuine and not a sham (Dkt. No. 37-1 at 38, 42).

Plaintiff alleges that, irrespective of the timing of the reorganization label, Defendants invented the Electricity Department's lack of profitability, which precipitated the discussions leading to the Council's eventual approval of the restructuring and his termination (Dkt. No. 37-1 at 29, 53, 54; 56-1 at 13).  As Electricity Director, Plaintiff's duties included preparing the Electricity Department's monthly financial reports and monitoring the department's expenses (Dkt. No. 40-4).  Plaintiff says that in October 2012, Ford, his supervisor, told him "to take a 'hands off' approach" to the monthly financial statements because the Finance Director would prepare them in the future (Dkt. No. 37-1 at 4 ¶10).  Plaintiff claims that he met with the Finance Director concerning the Electricity Department's reports and explained the method of accounting for the annual "Alternative Compliance Payment (ACP) to the Department of Energy Resources" (Dkt. No. 37-1 at 5 ¶11).  However, the ACP expense was not included in the Electricity Department's monthly financial statements after the Finance Director took over their preparation (Dkt. No. 37-1 at 5 ¶12).  Plaintiff also avers that Ford added two "administrative overhead" accounts' expenses of $206,141 to the Electricity Department's budget for the fiscal year that ended on June 30, 2013 (Dkt. No. 37-1 at 5 ¶13; Dkt. No. 40-14 at 4).  Based on the Electricity Department's fiscal year 2013 financial statements, Plaintiff alleges that the majority of the $220,415 loss can be attributed to the error in accounting for the ACP plus the one-time shift of administrative expenses (Dkt. No. 37 at 12 ¶18; Dkt. No. 37-1 at 5 ¶13; Dkt. No. 37-1 at 23, 24).  A factfinder drawing inferences favorable to Plaintiff could reasonably conclude that Ford included the administrative overhead expenses in the Electricity Department's budget and reassigned the preparation of the department's financial statements in order to manufacture the fiscal year 2013 loss and create a reason to propose Plaintiff's discharge (Dkt. No. 37 at 10 ¶12;

Dkt. No. 37-1 at 4-5 ¶¶10-13). [8]  *See Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (in

determining whether summary judgment is proper, "a court must view the record in the light

most favorable to the nonmoving party and give that party the benefit of all reasonable

inferences in its favor").

The proposal to discharge Plaintiff was kept secret, which is more akin to firing than a

lay off that was conducted pursuant to a preconceived plan.  *See Potkay*, 34 F. Supp. 3d at 950

(finding the fact that the mayor acted "behind the scenes rather than openly . . ." suggested that

plaintiff was fired).  On August 8, Ford told the Executive Committee that he had not discussed

the proposed restructuring with the staff and Defendants did not give Plaintiff notice of his

discharge (Dkt. No. 37-1 at 5 ¶5, 29; Dkt. No. 40 at 8 ¶17; Dkt. No. 56-1 at 13).  The Executive

Committee discussed the restructuring of the Electricity Department and Plaintiff's discharge on

August 8, 15, and 22, 2013 in meetings that were not open to the public (Dkt. No. 37-1 at 29, 53,

54).  The AG later opined that these three meetings should have been open and that the

Executive Committee violated the OML by holding closed-door sessions (Dkt. No. 1 Ex. D).

Plaintiff supplies evidence of the haste surrounding his discharge as further proof that the

reorganization was not the result of a study of the Electricity Department's needs, but instead was

a subterfuge designed to terminate him (Dkt. No. 56).  *See Mancini,* 2016 WL 4709108, at *7

(holding that plaintiff's employer's failure to investigate the need to eliminate plaintiff's position

was proof of pretextual discharge).  The absence of a discussion of the reorganization at the

---

[8] Alternatively, Plaintiff argues that Defendants, citing the budget deficit, terminated his
employment for cause.  He points to some, albeit scant, evidence in the Executive Committee's
minutes of August 8, 2013 to support this contention (Dkt. No. 37 at 12 ¶¶17-19; Dkt. No. 37-1
at 5 ¶13, at 29; Dkt. No. 45-1 at 11 ¶¶18, 19).  If a factfinder were to conclude that Plaintiff was
discharged for cause, it would follow that his due process rights were violated.  *See Loudermill*,
470 U.S. at 542.

Electricity Committee's July 17, 2013 meeting that Plaintiff and the Council's vice chair attended could lead a reasonable factfinder to infer that the reorganization was not planned (Dkt. No. 56-1 at 5).  In addition, the Electricity Committee's chair's comment on the "suddenness" of Plaintiff's discharge supports a plausible inference that the chair was not given advance notice of the proposal to terminate Plaintiff's employment as part of a broader restructuring scheme that had been contemplated for a period of time (Dkt. No. 56-1 at 5, 9, 10).  From this evidence, a factfinder could reasonably conclude that the reorganization materialized in order to discharge Plaintiff without complying with the Personnel Manual's terms.

Defendants, for their part, allege that eliminating Plaintiff's position and hiring a third-party consultant was part of a genuine "reorganization plan" designed to "save money and costs and correct gaps of expertise" (Dkt. No. 37-1 at 29, 38-39, 53; Dkt. No. 40-1 at 3 ¶¶6-7; Dkt. No. 56-1 at 19). [9]  *See Duffy v. Sarault,* 892 F.2d 139, 147 (1st Cir. 1989) ("Where a reorganization or other cost cutting measure results in dismissal of an employee no hearing is due"); *Campana,* 164 F. Supp. 2d at 1094; *Digiacinto,* 818 F. Supp. at 906 (evidence of an "extensive reorganization plan" developed over months indicated that plaintiffs were terminated pursuant to a good faith reorganization).  Ford denies that he transferred the responsibility for the Electrical Department's budget from Plaintiff to the Financial Director in October 2012 (Dkt. No. 40-14 at 4).  The Executive Committee's meeting minutes of August 8, 2013 reflect that the Executive Committee did not name Plaintiff as the cause of the Electricity Department's lack of profitability in fiscal year 2013 (Dkt. No. 37-1 at 29).  Instead, viewing the minutes in the light most favorable to Defendants, Ford took responsibility for the Electricity Department's deficit

---

[9] Whether Defendants' partnership with CPG was designed to achieve this goal is a question of fact.

(*id.*).  These minutes also indicate that Ford previously had explored having a consultant assume

the department's "technical responsibilities," and Barnett and Ford had discussed the Electricity

Department's status and inferably a reorganization plan, prior to that meeting when Ford

proposed it (*id.*).

Defendants respond to Plaintiff's allegation that the Executive Committee's closed session

minutes were fabricated by asserting that they accurately reflect what occurred on August 8, 15,

and 22, 2013 (Dkt. No. 40 at 7-8 ¶¶9, 11, 12, 14, 15) .  Legal counsel explained to the AG the

Executive Committee's basis for believing that the closed-door sessions on those dates were

lawful and he reviewed the minutes prior to their release to determine whether "continued non-

disclosure" was warranted (Dkt. No. 37-1 at 46-52).

A factfinder could view Defendants' adherence to the Council's Charter's procedure for a

reorganization as proof of its legitimacy (Dkt. No. 37-1 at 19-20; Dkt. No. 40 at 7-8 ¶¶8, 10, 13,

14).  *Contrast Mancini*, 2016 WL 4709108, at *8 ("Evidence that [defendants] failed to comply

with its Layoff Policy casts further doubt on its claim that it engaged in a bona fide

reorganization plan.").  In accordance with the charter, Ford presented the plan to the Executive

Committee on August 8 and 15, 2013 (Dkt. No. 37-1 at 19-20, 29, 53).  On the latter date, the

Executive Committee voted to support the restructuring and to eliminate Plaintiff's position (Dkt.

No. 37-1 at 19-20, 53).  The Executive Committee presented the Electricity Department's

"financial history" and the reorganization plan to the full Council on August 22, 2013 (Dkt. No.

37-1 at 19-20, 54; Dkt. No. 56-1 at 13).  The requisite two-thirds of the councilors approved it

(Dkt. No. 37-1 at 19-20; Dkt. No. 56-1 at 13).

The parties have presented conflicting evidence on the question of whether Defendants

targeted Plaintiff, or eliminated the Electricity Director's position pursuant to a preconceived

planned reorganization.  Accordingly, the cross motions present a genuine dispute of material fact.

        b.     Whether the alleged reorganization was undertaken to realize cost saving and efficiency.

A related factor in the examination of the bona fides of a reorganization is whether or not the restructuring was undertaken to achieve economic benefits or efficiency, which are legitimate concerns of a governmental entity.  *See Hartman*, 636 F. Supp. at 1410 ("A 'no dismissal except for cause' rule is a shield to armor public employees against unwarranted personal attacks or unfair discrimination by their superiors; it is not a monkey wrench casually to be thrust into the machinery of government in order to frustrate legitimate change.").  "A position may be abolished pursuant to a genuine reorganization plan if the reorganization would, for example, promote efficiency and economy . . . or if the position is no longer necessary."  *Sheriff of Plymouth Cty. v. Plymouth Cty. Pers. Bd.*, 802 N.E.2d 71, 74-75 (Mass. 2004) (citations omitted).  *See Schulz,* 645 F.3d at 953 (holding that evidence demonstrated that defendant eliminated plaintiff's position to save money and "not to rid itself of [plaintiff]"); *Limes-Miller*, 773 F. Supp. at 1139 (defendant produced "uncontroverted evidence" that the reorganization occurred to eliminate the duplication of services); *Lampman v. Ternus*, No. C10-3025-MWB, 2012 WL 379938, at *5-6, *11 (N.D. Iowa 2012) (holding that the lay-off of court reporters due to budget cuts was legitimate because it would result in cost savings); *Connolly*, 2011 WL 3739064, at *12 ("When a public employee is laid off due to lack of funds without a hearing, no due process violation occurs.") (citing *Whalen*, 397 F.3d at 25).

Saving money was one of the stated goals of the Electricity Department's restructuring (Dkt. No. 37-1 at 53).  However, the parties present conflicting evidence on the question of whether or not cost savings were anticipated from terminating Plaintiff.  In support of Plaintiff's

position that the reorganization was not initiated for economic reasons, he submitted an August 12, 2013 proposal from CES that lists its proposed services at a cost of $101,927 (Dkt. No. 37-1 at 72).  His annual salary was $75,000 and Defendants have supplied his job description (Dkt. Nos. 40-3, 40-4).  After Plaintiff's discharge, he told Defendants that he could perform the same services as the consultant without "a major monetary difference" between his compensation and the cost of the consultant (Dkt. No. 37-1 at 38, 43).

On the other hand, the Executive Committee's meeting minutes indicate that the Electricity Department's sales decreased after 2008-2009, while expenses remained unchanged, and "the electricity program has lost money in the majority of years it . . . operat[ed]" (Dkt. No. 37-1 at 29, 38; Dkt. No. 56-1 at 13).  The third-party consultant's ability to control fees that the Council paid was a factor that supported the Executive Committee's recommendation of the reorganization to the full Council (Dkt. No. 56-1 at 13).  The representation that the consultant's cost was "easier to budget and price" was another (*id.*).

Despite evidence that the Electricity Department's revenue exceeded expenses in fiscal years 2014 and 2015 after Plaintiff's discharge (Dkt. No. 37-1 at 23), the parties present insufficient evidence for the court to determine as a matter of law whether or not Defendants genuinely believed in August 2013 that their decision to discharge Plaintiff and to hire the consultant would decrease costs and increase efficiency.  *Compare Mancini,* 2016 WL 4709108, at *8 n.8 (evidence that "[t]here was no independent evaluation of the cost-savings that would result from the defendants' plan" supported the jury's determination that the reorganization was a pretext) *with Hartman,* 636 F. Supp. at 1418 (trial evidence proved that the elimination of plaintiff's position "was an authentic economy measure").  This unresolved factual issue cannot be decided by summary judgment.

c.      Whether another assumed Plaintiff's responsibilities after the reorganization.

One factor commonly used to determine the legitimacy of a reorganization is whether the discharged employee's duties were transferred to another employee after the reorganization, or whether his position was abolished.  The former tends to indicate a pretextual restructuring, while the latter suggests a genuine one.  *See Misek*, 783 F.2d at 101 ("plaintiffs assert that the reorganization was a sham and that their jobs were never abolished"); *Campana*, 164 F. Supp. 2d at 1094 (determining legitimacy of reorganization involved comparing the qualifications and duties of the new and former positions); *Limes-Miller*, 773 F. Supp. at 1140 (holding that new employees taking over plaintiff's position under a different title would be suggestive of a sham reorganization); *Ryman v. Reichert*, 604 F. Supp. 467, 469 (S.D. Ohio 1985) ("'The actual duties [of the abolished position and the new one] will be examined in order to determine whether a civil service job has been abolished in good faith or as a subterfuge.'") (quoting *Weston v. Ferguson*, 457 N.E.2d 818, 819-20 (Ohio 1983)).

Plaintiff alleges that his job as Electricity Director was not eliminated, but was merely outsourced to the third-party consultant who assumed his responsibilities (Dkt. No. 45-1 at 17 ¶12, 19 ¶19).  *See Schulz*, 645 F.3d at 953 ("similarities between old and new positions may be relevant but it is not controlling" in determining whether the reorganization was a pretext). Plaintiff had considerable business training and experience, particularly in "energy marketing and municipal electricity aggregation" (Dkt. No. 37-1 at 3 ¶¶3, 4).  Plaintiff's job description, which was incorporated by reference into his employment agreement, included duties that involved technical expertise (Dkt. No. 1 Ex. A at 2; Dkt. No. 37-1 at 48; Dkt. No. 40-4 at 3-4).

The minutes of the meetings of the Executive Council and the full Council indicate that the consultant would take over the Electricity Department's "technical aspects" and would add

"expertise" (Dkt. No. 37-1 at 38, 53, 54; Dkt. No. 40-1 at 3 ¶5; Dkt. No. 56-1 at 13).  According

to Defendants, the consultant performed the following functions for which Plaintiff had been

responsible:  renewable portfolio management; licensing and permitting; electronic data

interface; and buying, hedging pricing, and other related retail service tasks (Dkt. No. 40-11 at

5).  Despite this overlap, however, Defendants claim that the position of Electricity Director was

eliminated and "still does not exist" (Dkt. No. 40-1 at 3 ¶5, at 4 ¶10; Dkt. No. 40-11 at 5).  In

2016, the Electricity Department is overseen by the Director of Energy Operations (Dkt. No. 40-

1 at 5 ¶13; Dkt. No. 40-13 at 6-7).

       The parties' conflicting positions on whether or not Plaintiff's position was abolished

present a genuine issue of material fact on this issue.  *See Kaibel v. Mun. Bldg. Comm'n*, 920 F.

Supp. 2d 1000, 1010-11 (D. Minn. 2013), *rev'd in part on other grounds*, 742 F.3d 1065 (8th Cir.

2014) (finding a genuine issue of material fact where there was an overlap in services performed

by new employees and discharged employees).

              d.      Whether the Electricity Department's organizational structure
                      changed after Plaintiff's termination.

       An analysis of the authenticity of a reorganization also involves a before and after

comparison of the employer's organizational structure.  An analogy can be drawn to cases in

which employees allege that a reduction in force was a pretext for a discriminatory discharge.  In

those circumstances, as here, "the number of positions eliminated is not determinative on the

pretext issue," *Small v. N.C. A. & T. State Univ.*, No. 1:13CV248, 2014 WL 4105406, at *13

(M.D.N.C. Aug. 20, 2014), but it is a factor to be considered in the inquiry of whether the

employee's termination was the result of a good faith reorganization, or whether it was

pretextual.  *See Potkay*, 34 F. Supp. 3d at 949 ("although the defendants call [their] action a RIF

[reduction in force] or layoff, it was a RIF of one, suggesting that it was a firing"); *Dougherty v.*

*Blue Cross Blue Shield of Mass., Inc.*, 966 F. Supp. 80, 88 (D. Mass. 1996) ("Even if [plaintiff]
was the only employee dismissed, that fact alone does not prove either that a reduction in force
did not occur, or that the reason advanced by [defendant] was a pretext.").

The parties' evidence differs on the question of whether the Electricity Department's
organizational structure and the duties of its non-clerical employees remained the same or
changed after Plaintiff's discharge.  It is undisputed that only Plaintiff's position was eliminated
in August 2013 (Dkt. No. 37-1 at 53; Dkt. No. 40-1 at 3 ¶¶ 5, 7).  The Executive Committee's
and the full Council's discussions of the reorganization indicate that the Council's Electricity
Department was not eliminated.  The department's strength was in its sales, accounting, and
clerical personnel, and these positions were retained (Dkt. No. 37-1 at 29, 38-39, 53; Dkt. No.
40-1 at 3 ¶4; Dkt. No. 56-1 at 13).  This evidence weighs in favor of Plaintiff's position that the
Electricity Department was not reorganized.  *See Campana,* 164 F. Supp. 2d at 1095 (noting that
the city council's decision not to fund the plaintiff's position targeted one employee, which
"makes the decision look less like a legitimate reorganization and more like a summary
dismissal").

Defendants, on the other hand, contend that three of the four full-time employees who
Plaintiff supervised are no longer Council employees, their positions were "eliminated or
restructured," and the one remaining employee's job description and title have changed "in large
part" (Dkt. No. 40-1 at 4-5 ¶¶10-13; Dkt. No. 40-11 at 4).  Prior to Plaintiff's discharge in August
2013, the descriptions of the four non-clerical staff positions in the Electricity Department were
as follows:   Electricity Director (supervisor); an electricity assistant; an electricity marketing
and customer service coordinator; and an electricity aggregation specialist (Dkt. No. 37-1 at 23,
48; Dkt. No. 40-4 at 2-4).  In 2016, the number of non-clerical staff in the Electricity Department

remained at four (Dkt. No. 40-13):  Director of Energy Operations (supervisor); Electricity

Program Assistant; Electricity Customer Service Representative; and Electricity Program Co-

coordinator (Dkt. No. 40-1 at 5 ¶13; Dkt. No. 40-13).

Given that the number of non-clerical employees in the Electricity Department remained

the same after Plaintiff's termination, whether the new positions recreated the old positions with

the same duties but with different titles, or whether they represent a true restructuring of the

Electricity Department is a question of fact for trial.  *See Campana,* 164 F. Supp. 2d at 1093

(determination of reorganization's legitimacy involves a comparison of the qualifications and

duties of the employees in the old and new positions); *Kavakich v. Bentleyville Borough*, Civil

Action No. 06-1114, 2008 WL 2563377, at *4 (W.D. Pa. June 24, 2008).

The parties' conflicting evidence bearing on Defendants' state of mind and motive present

questions that should be decided by a factfinder.  *See Anderson*, 477 U.S. at 250 ("The inquiry

performed [by a court considering a summary judgment motion] is the threshold inquiry of

determining whether there is the need for a trial — whether, in other words, there are any

genuine factual issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party.").  In summary, the court recommends that

Plaintiff's motion for summary judgment on Count I be denied because whether he was

terminated for cause or pursuant to a legitimate reorganization of the Electricity Department

presents an unresolved factual question.  The court also recommends that Defendants' cross

motion for summary judgment on Count I be denied.  Although Plaintiff had a property right in

his continued employment based on his employment contract with the Council, whether the

elimination of Plaintiff's position fell within the reorganization exception to constitutional

procedural due process or whether the reorganization was a sham presents a question of fact.

C.    Conspiracy to Violate 42 U.S.C. § 1983 (Count IV)

"In order to make out an actionable conspiracy under 42 U.S.C. § 1985, a plaintiff must demonstrate both that there was a conspiratorial agreement, and that there was actual abridgement of a federally-secured right."  *O'Rourke*, 121 F. Supp. 3d at 273 (citing *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir. 2001)).  *See Estate of Bennett v. Wainwright,* 548 F.3d 155, 178 (1st Cir. 2008) ("A civil rights conspiracy is commonly defined as 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'") (quoting *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988)).  Based upon the underlying facts and the reasonable inferences that can be drawn therefrom as discussed in Section B, *supra*, the parties present a genuine factual dispute as to whether Ford and the Executive Committee agreed to deprive Plaintiff of his constitutionally protected property interest in continued employment without procedural due process and did so, or whether Plaintiff was dismissed pursuant to a genuine reorganization of the Electricity Department that excused Defendants from discharging Plaintiff for cause and affording him his due process rights to pretermination notice and the opportunity to respond.  Thus, Plaintiff's motion for summary judgment on Count IV should be denied, as should Defendants' motion for summary judgment.

D.    Breach of Contract (Count II)

Plaintiff argues that Defendants breached his employment contract by dismissing him without cause and without providing him with "written notice of the discharge" and "the right to appeal" as the terms of the Personnel Manual required.  Defendants' response is two-pronged: either Plaintiff was an at-will employee who did not have contract rights; or the contract terms

did not apply to Plaintiff's discharge because he was laid off due to a reorganization that eliminated his position, not due to subpar performance.

"To prevail on a claim for breach of contract [in Massachusetts], a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016).  In denying Defendants' motion to dismiss on the breach of contract claim, the district court rejected Defendants' contention that Plaintiff was an at-will employee and found that the Personnel Manual constituted Plaintiff's implied employment contract.  *See O'Rourke*, 121 F. Supp. 3d at 274-75.  For the reasons discussed earlier, this ruling is the law of the case.

The law of the case doctrine, however, does not resolve the question of the legitimacy of the Electricity Department's reorganization as raised in the parties' cross motions for summary judgment because Defendants did not argue the reorganization exception before the district court at the motion to dismiss stage and because the parties present new evidence on this issue.  *See Naser Jewelers, Inc. v. City of Concord,* 538 F.3d 17, 20 (1st Cir. 2008).  Plaintiff argues that Defendants breached the contract by failing to abide by the terms that required cause and due process procedures prior to the discharge of a department head.  Defendants contend that the termination of Plaintiff's employment was exempt from the contract's terms because Plaintiff was dismissed as part of a bona fide departmental reorganization that eliminated his position.  Section 2 of Plaintiff's employment contract, which governed the term of his employment, incorporated by reference the provisions of the Council's charter which, in turn, provided, in relevant part, that the Executive Director was entitled, from time to time, to present plans of organization or

34

reorganization for the "orderly, efficient or convenient conduct" of the Council's business (Dkt. No. 1 Ex. A at 2; Dkt. No. 37-1 at 8, 19). The Council was entitled to reorganize, consolidate, or abolish any agency of the Council, in whole or in part (Dkt. No. 37-1 at 19-20; Dkt. No. 40 at 7 ¶10). Thus, the term of Plaintiff's employment was subject to the Council's right to effect a bona fide reorganization of a department, such as the Electricity Department in which Plaintiff was employed. Because there are material factual disputes as to whether the Council engaged in a bona fide reorganization of its Electricity Department, the court recommends that the cross motions for summary judgment on Count II be denied.

IV.    CONCLUSION

Although Plaintiff had an implied employment contract pursuant to the law of the case, the undersigned recommends that Plaintiff's motion for summary judgment (Dkt. No. 36) be denied, and Defendants' cross motion (Dkt. No. 39) be denied because there is a genuine factual dispute about whether the purported reorganization of the Electricity Department was legitimate or was a pretext for Plaintiff's unlawful termination.[10]

Dated:  September 23, 2016                    /s/ Katherine A. Robertson
                                              KATHERINE A. ROBERTSON
                                              UNITED STATES MAGISTRATE JUDGE

---

[10] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.